Pro Se 1 (Rev. 09/16) Complaint for a Civil Case

# UNITED STATES DISTRICT COURT
### for the
### District of Massachusetts

| | |
|---|---|
| Richard L. Banks, Jr. | ) Case No. _____ |
| | ) *(to be filled in by the Clerk's Office)* |
| _____ | ) |
| *Plaintiff(s)* | ) |
| *(Write the full name of each plaintiff who is filing this complaint.* | ) Jury Trial: *(check one)* ☑Yes ☐No |
| *If the names of all the plaintiffs cannot fit in the space above,* | ) |
| *please write "see attached" in the space and attach an additional* | ) |
| *page with the full list of names.)* | ) |
| –v– | ) |
| Massachusetts Department of Public Health | ) |
| | ) |
| _____ | ) |
| *Defendant(s)* | ) |
| *(Write the full name of each defendant who is being sued. If the* | ) |
| *names of all the defendants cannot fit in the space above, please* | ) |
| *write "see attached" in the space and attach an additional page* | ) |
| *with the full list of names.)* | ) |

## COMPLAINT FOR A CIVIL CASE

## I.    The Parties to This Complaint

### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Richard L. Banks, Jr. |
| Street Address | 34 Parley Avenue |
| City and County | Jamaica Plain, MA |
| State and Zip Code | 02130 |
| Telephone Number | 617.792.0670 |
| E-mail Address | rabanks1@msn.com |

### B.    The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Defendant No. 1

    Name                                           **Massachusetts Department of Public Health**

    Job or Title *(if known)*

    Street Address                             **250 Washington Street**

    City and County                           **Boston**

    State and Zip Code                      **Massachusetts**

    Telephone Number                     **617.624.6000**

    E-mail Address *(if known)*

Defendant No. 2

    Name

    Job or Title *(if known)*

    Street Address

    City and County

    State and Zip Code

    Telephone Number

    E-mail Address *(if known)*

Defendant No. 3

    Name

    Job or Title *(if known)*

    Street Address

    City and County

    State and Zip Code

    Telephone Number

    E-mail Address *(if known)*

Defendant No. 4

    Name

    Job or Title *(if known)*

    Street Address

    City and County

    State and Zip Code

    Telephone Number

    E-mail Address *(if known)*

JURISDICTION

1. This complaint arises pursuant to Title VII of the Civil Rights Act of 1964 (42 USC 2000e).

2. This court has jurisdiction to address this matter pursuant to 28 USC 1331

3. Venue is proper pursuant to Title VII of the Civil Rights Act of 1964 because defendants' unlawful discrimination against Mr. Banks occurred at the offices of the Massachusetts Department of Public Health in Boston, Massachusetts.

EXHAUSTION OF ADMINISTRATIVE REMEDIES

4. On September 6, 2022, Mr. Banks filed a complaint with the Massachusetts Commission Against Discrimination (MCAD) and the Equal Employment Opportunity Commission (EEOC).

5. The MCAD dismissed Mr. Banks' charge on April 14, 2025, and the EEOC served Mr. Banks with a Closure Notice on September 11, 2025.

6. All conditions precedent to the initiation of this action have been fulfilled.

FACTS

A.    <u>Richard Banks' professional background and employment history</u>

7. Mr. Banks graduated from law school and became a member of the Massachusetts bar in 1989.

8. Between 1989 and 2003, Mr. Banks practiced as an attorney in Massachusetts, including working for roughly 3 years as an Assistant District Attorney.

9. Mr. Banks began working as a Prosecutor in the newly created Prosecution Unit at the Massachusetts Department of Public Health in 2003.

10. Mr. Banks and the other DPH Prosecutors were responsible for prosecuting complaints against licensed healthcare providers including nurses, dentists, pharmacists and other healthcare professionals.

B.    Richard Banks' role in the Prosecution Unit

11. Mr. Banks was consistently rated as meeting or exceeding all performance standards.

12. Multiple performance evaluations referred to Mr. Banks' professionalism and positive relationship with the staff of Boards he worked with.

13. Mr. Banks officially and unofficially helped to orient new hires to the practices of the Prosecution Unit and was viewed as a resource by other Prosecutors.

14. Mr. Banks was the only black employee in the Prosecution Unit until 2022.

C.    Nursing Board Executive Director's Actions

15. In or around December of 2017, the fairly new Nursing Board Executive Director, Lorena Silva (white/Hispanic/female), repeatedly called Mr. Banks an "ass" and an "asshole" in the presence of co-workers at an off-site party for DPH employees.

16. Executive Director Silva did not speak to the other Prosecutors in this manner.

17. A supervisor under Executive Director Silva heard her say that she did not like Richard Banks. That supervisor agreed that Executive Director Silva treated Mr. Banks differently from how she treated the other Prosecutors.

18. In or around November of 2018, during a board meeting, Mr. Banks asked a Nursing Board member what the Board's policy was on a relevant issue. That board member took some slight offense.

19. Executive Director Silva and the Chief of the Bureau of Health Professions Licensure, James Lavery (white/male), encouraged the above-referenced Nursing Board members to complain to the Governor's Office about the manner in which Mr. Banks asked the question.

20. Executive Director Silva and Chief Lavery never encouraged other board members to complain to the Governor's Office about their exchanges with DPH attorneys.

21. Chief Lavery knew that DPH attorney Vita Berg (a white female) had previously yelled at and scolded a Dental Board member, but he did not encourage that board member to complain to the Governor's Office about that interaction.

22. DPH's Chief of Operations, Eileen Sullivan, approved of and/or encouraged the act of complaining to the Governor's Office about Mr. Banks' interaction with a board member.

23. Records regarding the board member's complaint would qualify as "personnel records" as defined in M.G.L. c.149, s.52C and therefore would have been required to have been placed in Mr. Banks' personnel file.

D.    <u>Executive Director Silva and Chief Lavery attempted to humiliate Richard Banks</u>

5

24. In or around November of 2019, Mr. Banks was asked to be present at a closed Nursing Board meeting where the Board was to consider Nurse CL's request to receive credit for time she had been summarily suspended.

25. Mr. Banks had settled a complaint against Nurse CL by having the nurse sign a consent agreement for a 3-year loss of license 3 months earlier.

26. The Nursing Board had never called a Prosecutor to a closed Board meeting for the sole purpose of having that Prosecutor witness its consideration of nurse's request for credit for the time they were out of practice due to summary suspension.

27. At the closed meeting, the Nursing Board, under the guidance and direction of Executive Director Silva, Nursing Board Chair Barbara Levin (white female), and Chief Board Counsel Vita Berg, and Board Counsel Beth Oldmixon (white female), denied Nurse CL's request for credit for time served.

28. The Nursing Board had total discretion on whether to grant credit for time served to Nurse CL and could have chosen to grant her request. No such request had been denied in the previous 15 years.

29. The Nursing Board's decision to deny Nurse CL's request for "credit for time served" had the effect of adding an additional roughly 2 years loss license to the 3-year loss of license the Board had initially deemed appropriate in the case.

30. Executive Director Silva, Board Chair Barbara Levin, and Chief Board Counsel Vita Berg, Board Counsel Oldmixon, and Bureau Chief James Lavery orchestrated the presence of Mr. Banks at the board meeting and the denial of Nurse CL's request, for the sole purpose of causing Mr. Banks to witness the Board's action and to feel

responsible for the additional years of suspension that Nurse CL would have to serve.

31. Executive Director Silva, Board Chair Barbara Levin, Chief Board Counsel Vita Berg, Board Counsel Oldmixon, and Bureau Chief James Lavery never called Mr. Banks' white co-workers to witness a decision on a nurse's request for credit for time served and never denied credit to a nurse whose case was settled by a white co-worker.

32. Mr. Banks was treated differently and in a discriminatory way by Executive Director Silva, Board Chair Barbara Levin, Chief Board Counsel Vita Berg, Board Counsel Oldmixon, and Bureau Chief James Lavery because of his race and color.

E.    Richard Banks was unfairly placed on Paid Leave

33. In the fall of 2019, Nurse CL claimed that Mr. Banks had promised her that she would receive credit for the time she had spent summarily suspended and implied that she signed a consent agreement that did not contain that provision because of that "promise."

34. Executive Director Silva, Bureau Chief Lavery, General Counsel Cooke (white/female), and C.O.O. Sullivan Nurse credited CL's claim that Mr. Banks had promised her that she would receive credit for her time out of practice despite the fact that Mr. Banks reported otherwise, had a reputation for honesty and professionalism, and Nurse CL had been found not credible by a DPH Hearing officer at her summary suspension hearing.

35. The credibility of Mr. Banks' co-workers (all white Prosecutors) was never questioned by Executive Director Silva, Bureau Chief Lavery, General Counsel Cooke, or C.O.O. Sullivan. Those co-workers were always assumed to be honest in their dealings with licensees.

36. In late 2019, Mr. Banks was interviewed by DPH General Counsel Margret Cooke and Deputy Counsel Beth McLaughlin and informed them that he never promised Nurse CL that the Board would give her "credit for time served." Mr. Banks also stressed that the only exchanges he had with Nurse CL regarding credit for the time she had been summarily suspended occurred after she had signed and tendered a consent agreement that was silent on that issue -as evidenced by the records they possessed.

37. In February of 2020, Mr. Banks was called to a meeting with General Counsel Cooke and C.O.O. Eileen Sullivan and informed that he was being placed on leave (with pay) "pending further review of a serious matter."

38. At the meeting with G.C. Cooke and C.O.O. Sullivan, Mr. Banks was given a letter that informed him that he was not to speak to any DPH employees other than union representative about "this or any other work-related matters." The letter did not include an exception allowing him to speak to the DPH Diversity Officer.

39. DPH did not perform a thorough review of the "serious matter."

40. DPH did not provide a copy of any investigative report on the "serious matter" to Mr. Banks or his union representative.

41. DPH kept Mr. Banks on paid administrative leave beyond the time it took to complete its review of the matter.

42. DPH's goal in prolonging the paid administrative leave was to embarrass and humiliate Mr. Banks, to lower his status and standing among his peers, and/or in hopes that he would resign from the agency.

F.    Denial of Vacation/Personal Leave time

43. In early October of 2020, while he was on the paid administrative leave and without any indication as to when or whether he would be allowed to return to work, Mr. Banks filed a request to use approximately 6 weeks of personal and vacation time in November and December of 2020.

44. Although Mr. Banks was the longest serving member of the Unit and had seniority with respect to leave requests, the Unit had presumably been operating without him for nearly 10 months, and another Prosecutor (white female) had taken a similarly long leave not long before, this request was denied.

G.    Wrongful Suspension

45. In late October of 2020, Mr. Banks was notified that he was suspended for 5 days (without pay) and would be required to complete an ethics course as a result of his handling of the Nurse CL case.

46. The letter suspending Mr. Banks included multiple falsehoods.

47. The letter wrongly stated that the Nursing Board issued a "clear directive" regarding whether Nurse CL should have credit for time serve. In 2018, the Nursing Board's

ruling only addressed whether it would accept "time served" up to that point as an acceptable final sanction.

48. The letter wrongly stated that Mr. Banks drafted a consent agreement "in conformance with the Board's "clear directive on "time served."" Mr. Banks drafted the first consent agreement in accordance with the referral sheet the Nursing Board staff sent to the Prosecution Unit. The Prosecution Unit never inserts "credit for time served" language unless the Board expressly directs it to do so.

49. The letter wrongly stated that Mr. Banks assured Nurse CL that she would get credit for time served. Mr. Banks made no representation to Nurse CL about whether she would get credit for time served prior to Nurse CL signing and tending the first consent agreement. Later comments by Mr. Banks were clearly communicated to the nurse merely as the expectations of the Prosecutor.

50. The letter wrongly stated that Mr. Banks did not listen to the 2018 recording of the Board's action. Mr. Banks did listen to the recording and provided his notes on minute markers of the recording as proof.

51. It wrongly stated that Mr. Banks agreed that the credit for suspended time was "likely denied because of the serious nature of the Licensee's misconduct and the Licensee's refusal to admit wrong-doing;" Mr. Banks only agreed that the Board likely did not agree to grant the nurse's request for a 1-year suspension in 2018 because of the seriousness of the case and the nurse's refusal to take responsibility of her actions.

52. It wrongly stated that Mr. Banks' emails to Nurse CL contained "clear promises" that the nurse would receive credit for time served. The emails make it clear that Mr. Banks was expressing only his expectations. Additionally, Mr. Banks reminded the nurse verbally that the final decision would be up to the Board.

53. The letter wrongly stated that Mr. Banks did not hear the Board's recommendation at its 2018 meeting involving Nurse CL.

54. The letter wrongly stated that Mr. Banks gave Nurse CL advice to make a Motion for Reconsideration. Mr. Banks informed Nurse CL of Prosecution Unit and Nursing Board procedures. This practice was considered appropriate by all members of the Prosecution Unit when working with pro se licensees.

55. The letter wrongly stated that Mr. Banks "unfairly took advantage of the Licensee." Mr. Banks went to extraordinary lengths to assist this pro se licensee, including drafting a second consent agreement at her request.

56. The suspension letter, suspended Mr. Banks, in part, not for violating Massachusetts Rules of Professional Conduct 4.3, but for "*potentially* violating the Massachusetts Rules of Professional Conduct 4.3" (emphasis added).

57. Disciplining Mr. Banks on the mere suspicion that he did something wrong is improper.

58. The letter suspending Mr. Banks advised him that he could contact the Diversity Officer but provided incomplete contact information for the Officer.

59. Mr. Banks filed a grievance over the discipline. At the grievance hearing General Counsel Cooke acknowledged that the allegation that he had engaged in Prosecutorial Conduct had been made in error.

60. Following the hearing, in January of 2022, a Department of Human Resources Hearing Officer ruled that the appropriate discipline for Mr. Banks was a Written Warning. The Hearing Officer directed that the suspension be removed and that Mr. Banks receive all back pay and benefits. The Hearing Officer did not remove the requirement that Mr. Banks complete an ethics course.

61. DPH management did not exercise its authority to impose a Written Warning, but it also did not inform Mr. Banks that it would not be imposing the Written Warning.

62. From the day of the Hearing Officer's ruling until Mr. Banks left DPH in August of 2023, DPH management possessed the power to impose the Written Warning and require him to complete an ethics course.

63. Mr. Banks could not or grieve or contest a Written Warning that had not been imposed.

H.  Return to office

64. Mr. Banks returned to the office after serving the suspension on October 29, 2020. At that time, the DPH Offices were operating under Covid-19 protocols which included directing staff to work remotely when possible, rather than coming into the office.

65. When Mr. Banks returned from the suspension, his co-workers had all been provided with laptop computers and cell phones to allow them to work remotely.

66. Mr. Banks' co-workers worked in the office only one day per week or in some case worked exclusively from home during this period.

67. Mr. Banks was not provided with a cell phone until several weeks after he returned to work and was not provided with a laptop until roughly 5 weeks after he returned to work.

68. Mr. Banks was obligated to work in the office 5 days per week for roughly 5 weeks while his white co-workers were able to work primarily remotely.

69. Mr. Banks had greater exposure to the Covid-19 risks than his white co-workers as a result of being required to be in the office during this period.

70. Mr. Banks was over the age of 60 when he was required to work in office and had a greater risk of serious effects from exposure to Covid than his co-workers.

71. DPH management was uniquely aware of the increased risk Covid-19 presented to individuals age 60 and over.

72. DPH also denied Mr. Banks access to all electronic files and emails that he had access to before the suspension.

73. DPH falsely claimed that the files and emails were gone and could not be recovered.

74. Mr. Banks' inability to access years of research and resources he stored on the DPH system hampered his effectiveness and efficiency when he returned from the suspension.

I.    Requests to obtain and/or view personnel records

75. Mr. Banks was entitled to receive a copy of his personnel records upon request by the terms of a collective bargaining agreement between his union and DPH - Nage/Commonwealth collective bargaining agreement Article 24.1

76. Mr. Banks was entitled to receive a copy of his personnel records within 5 days of his written request by state law -M.G.L. c.149, s. 52.

77. Mr. Banks filed a written request for a copy of his full personnel file on July 17, 2020 ("first request"). The request was sent to General Counsel Margret Cooke via email.

78. On July 25, 2020, Mr. Banks received a response to his July 17, 2020 request that was missing multiple performance evaluations, did not include the February, 2020 letter placing him on paid leave (indicated to have been cc'd to his personnel file), and did not include documentation relating to the Nursing Board member's complaint to the Governor's Office.

79. Mr. Banks filed another written request for a copy of his full personnel file on July 27, 2020 ("second request"), citing documents that were known to be missing from the first production. This request was also sent to General Counsel Margret Cooke via email.

80. On August 14, 2020, Mr. Banks received a response to his July 27, 2020, request. Additional performance evaluations were provided, but the packet still did not include multiple performance evaluations, the letter placing Mr. Banks on paid leave, and documentation relating to the board member's complaint to the Governor's Office.

81. Mr. Banks sent a letter via certified mail to Acting General Counsel Elizabeth Scurria Morgan in January of 2021 ("third request") asking to "examine and copy" his personnel file. Acting General Counsel Morgan did not respond to this request.

82. Mr. Banks sent a letter via certified mail to DPH Commissioner Bharel on March 23, 2021 ("fourth request") requesting to view and copy his full personnel file as allowed by M.G.L. c.149, s.52C.

83. On April 2, 2021, Mr. Banks received an email with an attachment. The electronic records did not include several performance evaluations, did not include either the letter placing the Mr. Banks on paid leave or the letter suspending him (although both letters were reportedly cc'd to his personnel file), did not include documentation relating to the board member's complaint to the Governor's Office, and did not include copies of any of the prior requests for copies of or access to his personnel file.

84. The April 2, 2021, response also did not invite Mr. Banks to view his personnel records.

85. Mr. Banks did not receive his full personnel file through his multiple requests.

J. <u>Additional efforts to obtain personnel file</u>

86. On August 20, 2020, Mr. Banks filed a grievance over DPH's failure to provide him with his complete personnel file.

87. Martin Roach from the Department of Human Resources was assigned to represent DPH in the grievance matter.

88. Martin Roach was asked by Mr. Banks and by his union representative several times for assurances that the personnel records delivered to Mr. Banks constituted his complete personnel record.

89. Martin Roach never asserted that the personnel records delivered to Mr. Banks constituted his complete personnel record.

90. A Step III hearing was held on this grievance on December 2, 2022.

91. The delay between the filing of the complaint and the holding of the hearing was unusually long.

92. At the hearing, Human Resources staffer Lynda Myers stated that she had provided all of the records in her possession. However, there was no evidence presented to show that she possessed ever possessed Mr. Banks' full personnel file.

93. At the hearing, Ms. Myers could not explain why her department had not produced letters that DPH management documented cc'ing to Mr. Banks' personnel file.

94. Hearing Officer Matthew Hale informed the parties at the close of the hearing that he expected to issue a decision in approximately 2 weeks.

95. Mr. Banks reached out to Hearing Officer Hale at least 10 times between December of 2022 and early 2024 regarding when a decision would be issued.

96. In May of 2024, Mr. Banks reached out to the Chief of Human Resources for assistance in getting a decision on the grievance matter.

97. Hearing Officer Hale issued a ruling on the grievance on July 8, 2024, more than 18 months after the hearing.

98. Hearing Officer Hale's ruling found that Mr. Banks had been provided with his full personnel file without Ms. Myers claiming or Representative Roach arguing that Mr. Banks had been provided with his full personnel file.

99. Hearing Officer Hale did not respond to Mr. Banks' July 19, 2024, *Request for Reconsideration*.

100.   Hearing Officer Hale's ruling on Mr. Banks' grievance was not supported by the facts in the case.

101.   Hearing Officer Hale's delay in ruling on Mr. Banks' grievance was extraordinary.

102.   Hearing Officer Hale's decision and delay were the result of his efforts to assist DPH in depriving Mr. Banks of his right to obtain his full personnel file.

K.   <u>DPH interference with Mr. Banks' efforts to obtain assistance from Diversity Officers</u>

103.   Mr. Banks and all DPH employees periodically received TGIF bulletins from EOHHS notifying staff of services and resources available to them. In 2021 and early 2022, those bulletins included notices to staff about the existence and availability of DPH's Diversity Officers.

104.   When Mr. Banks was placed on paid administrative leave, he was prohibited from speaking with the DPH Diversity Officer(s) by the terms of the letter given to him.

105.   DPH prevented Mr. Banks, a black employee, from exercising his right to speak to a Diversity Officer during the period he was on paid leave.

106.    The October *TGIF* bulletin (published by EOHHS) encouraged staff who had concerns about discrimination to contact their agency Diversity Officer.

107.    On November 17, 2021, Mr. Banks sent an email to Kevin Lovaincy, DPH's Diversity Officer, to request copies of letters purportedly cc'd to that office and to speak regarding certain DPH issues that were believed to relate to his role as Diversity Officer.

108.    On November 26, 2021, Mr. Lovaincy responded to Banks' email, apologized for the delay, and asked for Banks' telephone number. Banks provided his telephone number to Mr. Lovaincy approximately 30 minutes later.

109.    Mr. Lovaincy did not call Banks back and did not respond to subsequent emails Banks sent on December 9, 2021, and December 15, 2021.

110.    On December 28, 2021, Banks contacted the DPH Commissioner's Office and was told that Winston Pierre was the new Diversity Office Manager.

111.    Banks emailed Mr. Pierre on December 28, 2021, and Pierre called Banks back promptly, apologized for Mr. Lovaincy's failure to respond, and promised to call Banks later.

112.    On the afternoon of December 28, 2021, shortly after speaking to Mr. Pierre, Banks received an email from Mr. Lovaincy apologizing for the significant delay in responding and informing Banks that "...it was our understanding that your inquiry is more of an HR related matter. We are confirming the appropriate HR contact person now. We hope to circle back to you again shortly."

113.    Mr. Pierre assured Banks that Diversity Officers do not discuss specific cases with DPH staff but was unable to explain where Mr. Lovaincy got the impression that Banks' concerns were "more HR related."

114.    Mr. Pierre said he would call Mr. Banks back to discuss his concerns.

115.    When Mr. Pierre didn't call Mr. Banks back, Mr. Banks emailed him on January 10th, 14th, and 27th and he did not respond to any of those emails.

116.    DPH Interfered with Mr. Banks' privilege as an employee and a black employee to discuss his discrimination concerns with a Diversity Office.

117.    Executive Order 592 creating the role of Diversity Officers provides that Diversity Officers shall "...provide civil rights, equal opportunity, affirmative action, and diversity and inclusion services and shall coordinate these services through their respective Secretariats and agencies."

118.    An organizational chart for DPH Senior Managers shows the Manager of DEI reporting to, working with, or communicating with the DPH C.O.O., Eileen Sullivan.

119.    In his MCAD filing, Mr. Banks alleged that DPH General Counsel Margret Cooke told DPH's Diversity Officers not to respond to Mr. Banks.

120.    DPH did not deny the allegation that DPH General Counsel Margret Cooke told DPH's Diversity Officers not to respond to Mr. Banks.

121.    C.O.O. Eileen Sullivan, G.C. Margret Cooke, other members of the DPH management team or DPH attorney David Markowitz (or other DPH staff at their suggestion or direction) told or encouraged the DPH Diversity Officers to not address Banks' concerns.

L. <u>Departure from DPH</u>

122.      Mr. Banks resigned from DPH in August of 2023.

123.      Banks resigned because it was clear that DPH management had personnel

records relating to him which they had withheld.

124.      Mr. Banks resigned because DPH management had actively worked to

prevent him from accessing his full personnel record.

125.      Banks resigned because it was clear that DPH management would never

release his full personnel file.

126.      Mr. Banks resigned because he had legitimate concerns that he was being

discriminated against.

127.      Mr. Banks resigned because DPH management had actively worked to

prevent him seeking guidance or assistance from the agency Diversity Officers who

might help him address the discrimination issues.

128.      Mr. Banks resigned because DPH management had deprived him of some of

the resources that he needed to effectively and efficiently perform his job.


129.      Mr. Banks resigned because DPH management showed a callous disregard

for his health and safety when it required him to work in-office more than his co-

workers while knowing that he was at greater risk than those co-workers from Covid.

130.    Mr. Banks resigned because he believed that DPH had demonstrated a
pattern and practice of abuse and harassment that was continuous and had no
forceable end.

131.    It was clear to Banks that DPH management would never treat him fairly,
would never allow him to see his full personnel record, and would impose at least
the written Warning on him if there was ever an excuse.

132.    Mr. Banks was constructively terminated.

CAUSE OF ACTION

For the following count, Mr. Banks hereby realleges and incorporates by reference the
facts and allegations contained in the proceeding paragraphs of this pleading as if fully
set forth herein.

Count I

Violation of Title VII of the Civil Rights Act of 1964 (42 USC 2000e)- Discrimination on
the basis of race

Mr. Banks is a black man with a long and spotless record at DPH.

Beginning in or around 2017 and shortly after the hiring of Exec. Dir. Lorena Silva, DPH
managers began to treat the Plaintiff differently from how other Prosecutors were
treated.

DPH managers disapproved of his manner of speech.

DPH managers required him to be present at board meeting which Prosecutors were
not normally required to attend.

DPH managers worked actively to embarrass and humiliate him.

DPH managers manufactured false statements about his actions and speculated
irresponsibly on his motives.

DPH managers worked industriously to prevent him from exercising his right to view his personnel file.

DPH deprived him of resources needed to properly perform his job and to be safe in the workplace.

DPH showed disregard for his personal safety.

DPH management clearly treated Banks differently from his white co-workers.

DPH acted to prevent him, as a black employee, from seeking guidance and assistance from agency officers designated to address such concerns.


Wherefore, Plaintiff requests that the Court order:

Judgement for the Plaintiff;

The plaintiff be awarded compensatory and punitive damages;

The Plaintiff be awarded reasonable costs and fees;

The Plaintiff be awarded all other damages as permitted by law


Plaintiff demands a trial by jury

Respectfully Submitted

Richard L. Banks, Jr.


Richard L. Banks, Jr.    12/10/25

34 Parley Avenue

Jamaica Plain, MA 02130

617.792.0670